IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JERARDO GONZALEZ PEREZ,          :

     Petitioner,                            :

vs.                                                    : CIVIL ACTION NO. 11-0585-KD-C

UNITED STATES OF AMERICA,       : CRIMINAL ACTION NO. 10-0032-KD

     Respondent.

## REPORT AND RECOMMENDATION

Petitioner, Jerardo Gonzalez Perez ("Perez"), has filed a motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255 (Doc. 422; *see also* Doc. 425). This action has been referred to the undersigned for entry of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Following consideration of all relevant pleadings in this case, it is recommended that Perez' § 2255 motion be **DENIED**.

## FINDINGS OF FACT

On February 24, 2010, Perez was charged, by indictment, with conspiracy to possess with intent to distribute more than 50 grams of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 846,[1] and two counts of violating 21 U.S.C. § 841(a)(1) (on July 9, 2009, involving 7.1 grams of methamphetamine and, again, on July 23, 2009, involving 7 grams of methamphetamine).

---

[1]    "The amount of mixture and substance containing methamphetamine involved in the conspiracy exceeds 50 grams; therefore, the defendants are subject to the penalty provisions of Title 21, United States Code, Section 841(b)(1)(B)." (Doc. 1, at 2.)

(Doc. 1, at 1-2 & 5.)[2]

In accordance with the defendant's indication that he would enter a blind guilty plea, the government filed a factual resume with the Court on June 9, 2010. (*See* Doc. 91, at 1.) The factual resume reads, in relevant part, as follows:

### Elements of the offenses

**Count one**:   21 U.S.C. § 846, conspiracy to possess with intent to distribute methamphetamine, a Schedule II controlled substance.

There are two elements to this offense: first, that two or more individuals came to a mutual understanding to commit an unlawful act, in this case, the possession with inten[t] to distribute methamphetamine as charged; and second, that the defendant, knowing of the unlawful purpose of the plan, knowingly and intentionally joined in the plan. The Government has alleged that more than 50 grams of methamphetamine were involved in the scheme.

**Counts 11 and 12**:   21 U.S.C. § 841(a)(1), possession with intent to distribute methamphetamine, a Schedule II controlled substance.

In order to prove this offense, the Government must establish two elements: that the defendant knowingly and intentionally possessed methamphetamine, and that he possessed the drug with the intention to distribute it to another.

### Facts

In January of 2009, the Baldwin County Drug Task Force became involved in an investigation into methamphetamine distribution in the Bon Secour area of Baldwin County. The officers had received information from a confidential and reliable informant who told them that Cecil Dwight Rayborn II was selling methamphetamine. Sgt. Jeff Dunn and Officer Jesse Villa met with the informant, who had

---

[2]     The indictment also asserted a forfeiture count against all defendants. (Doc. 1, at 5-6.)

told them that Cecil Rayborn would sell to the informant. The informant and Cecil worked at the same construction company, and Cecil told the informant that he could get methamphetamine for the informant from his supplier. Cecil told the informant that he would charge $25 for getting the drugs, and that an eight-ball would cost $350. Cecil had told the informant that his supplier lived in Bon Secour[] and[,] on that day, January 30, Cecil told the informant that he was making a[] trip to get drugs.

.    .    .

Sgt. Dunn and Officer Villa met the informant at a predetermined location where Sgt. Dunn took custody of the drug evidence. Sgt. Dunn noticed that the amount of methamphetamine did not appear to be the full amount to be purchased, and formed the opinion that Cecil had removed some of the drugs prior to delivering them to the informant. The substance field tested positive for methamphetamine, and was submitted to the Department of Forensic Sciences laboratory for confirmation. The lab report confirmed that the substance was methamphetamine, weighing 2.97 grams. The next day, Sgt. Dunn returned to the mobile home where he had seen [Cecil Rayborn's] truck parked on the south side of County Road 16 east of the intersection with County Road 19. He made photographs of this residence and subsequently confirmed the address as 16550 County Road 16, the residence of Steve and Tammy Wilson.

On February 12, 2009, Sgt. Dunn met with the same informant, who again indicated that Cecil had offered to supply the informant with methamphetamine. Through further conversation with Cecil, Cecil had told the informant that his supplier lived on County Road 16. The informant told the officers that Cecil said he was making another trip to the supplier's residence there during the afternoon of February 12, 2009, and asked the informant if [he] wanted anything. The informant consulted with Sgt. Dunn, then notified Cecil that [he] wanted an eight-ball. Cecil told the informant to bring the money to his job site[] on County Road 24 just west of County Road 55.

.    .    .

Sgt. Dunn and Officer Villa established surveillance at 16550 County Road 16 and waited for Cecil to arrive. After two hours, the informant called Cecil and Cecil said he could

3

not leave the job site. Cecil asked the informant to pick him up something to eat, so the informant complied and brought the food to Cecil at the construction site. The informant and Cecil left the job site together and drove toward 16550 County Road 16. The deputies observed as the informant and Cecil arrived at the trailer. Cecil entered the trailer while the informant waited in the vehicle. After a few minutes, Cecil returned to the informant's vehicle and provided the informant with a clear ziplock baggie containing methamphetamine. The informant drove Cecil back to the construction site and dropped him off. The deputies followed them and met the informant at a predetermined location. The amount of methamphetamine again looked less than it should, and Sgt. Dunn had the informant place a phone call to Cecil to complain about the qua[ntity] of the methamphetamine purchased. Cecil agreed to make sure the amount was right the next time. Meanwhile, Sgt. Dunn field tested the drugs, and later submitted them to the Department of Forensic Sciences for analysis. The lab report indicated that the substance was methamphetamine weighing 2.29 grams.

On February 25, 2009, Sgt. Dunn, Cpl. Nathan Lusk and Officer Villa met with two reliable confidential informants who related that they could buy methamphetamine from Jennifer Rae Rayborn. The informants also told the officers that they understood that Jennifer was being supplied by a husband and wife who lived on County Road 16. The informants said that Jennifer referred to her suppliers as "Steve" and "Tammy." Jennifer said she would take the money from them for the methamphetamine, travel to County Road 16 to her suppliers' residence, get the drugs and bring them back. The informants told the officers that Jennifer said her suppliers charged her $350 per eight ball, and an additional $25 for the delivery.

.      .      .

On or about June 19, 2009, the officers met with another confidential and reliable informant regarding another purchase of methamphetamine from Jennifer Rayborn. The officers again searched the informant and the informant's vehicle, equipped the informant and the vehicle with electronic devices to record and videotape the transaction, and issued the informant prerecorded currency to make the drug buy.

.      .      .

4

The informant gave Jennifer the money for the drugs, and the officers followed her south toward County Road 16. They followed her to the Wilson residence, where they observed as she entered the trailer, stayed only a few minutes, then returned to her vehicle. She left and they followed her back to the parking lot where she met with the informant and delivered the methamphetamine. The surveillance officers made photographs of the meeting. They followed the informant to a predetermined location, where Sgt. Dunn took possession of the drug evidence and field tested it. He later submitted the drug evidence to the Department of Forensic Sciences, where the analysis of the drugs revealed that the substance was methamphetamine weighing 3.32 grams.

On July 6. 2009, Sgt. Dunn, acting in an undercover capacity, was introduced to Jennifer through the informant in a parking lot at a grocery store in Robertsdale, Alabama. Sgt. Dunn was equipped with electronic devices to record and videotape the transaction. During his meeting with Jennifer, Sgt. Dunn provided [her] with the prerecorded cash, and engaged her in conversation. Sgt. Dunn asked her if her supplier had come down on the price for a larger amount of methamphetamine, as he was attempting to purchase three eight-balls. She said yes. She also said that her supplied had screwed up with the main supplier. Sgt. Dunn asked Jennifer if she could go [directly to] the main supplier and cut out her source. She said she did not want to cut out her source. Jennifer left with the money, $1050 in cash, and drove to the Wilson residence, followed by Lt. Darren Williamson who was conducting surveillance. Officer Villa had established a position where he could observe[] the Wilson residence at 16550 County Road 16. He observed as Jennifer arrived. About 30 minutes later, she departed the Wilson residence and contacted Sgt. Dunn to arrange the meeting location for the delivery of the methamphetamine. . . . She approached Sgt. Dunn's vehicle and handed him the ziplock baggie containing the methamphetamine. . . . Sgt. Dunn weighed the bag and Jennifer commented that her supplier's scales are off. Sgt. Dunn asked what her supplier's scales read, and Jennifer said 10.9. Sgt. Dunn asked Jennifer if her supplier could do something larger, and she said she would ask. They had additional conversation about future buys and Jennifer said she would go around her suppliers if they kept cheating her. . . . Sgt. Dunn left with the drugs and met the other officers at a prearranged location. Officer Villa took possession of the drugs and turned them over to TFO Andre Reid, who

5

submitted them to the DEA South Central Laboratory for analysis. The lab report reflected that the substance was methamphetamine, weighing approximately 10 grams.

The officers applied for and received a search warrant for the Wilson residence at 16550 County Road 16. On July 9, 2009, Sgt. Dunn established surveillance at the Wilson residence on County Road 16. While he was watching the trailer, he observed as Jennifer Rayborn arrived at the residence and left shortly thereafter. Believing she had just obtained more methamphetamine from the Wilsons, the officers decided to execute the search warrant. . . .

Lt. Darren Williamson advised Steve Wilson of his Miranda rights. Wilson said he understood his rights and agreed to cooperate with the officers. He too[k] Sgt. Dunn to the bathroom of an RV which was parked beside the residence and pointed out a cabinet above the toilet and one above the vanity. Sgt. Dunn retrieved a black nylon bag containing pipes used to smoke methamphetamine, syringes, and several small clear baggies used to package methamphetamine. In [the] cabinet above the vanity, Sgt. Dunn found additional small baggies, one of which contained a small amount of methamphetamine. Two handguns were seized from a computer desk in the den of the residence itself. . . . Another black nylon bag was found in the bottom left hand drawer of a chest in the back bedroom. It contained numerous small ziplock baggies, digital scales, a small wooden scoop, a nickel and two ziplock baggies containing methamphetamine. These baggies contained approximately 3.5 grams of methamphetamine each. Tammy Wilson told the officers that she shared that bedroom with her daughter.

Both Tammy and Steve told the officers they wanted to cooperate. Sgt. Dunn advised Tammy of her Miranda rights, and she too indicated that she understood her rights and that she wanted to cooperate with the police. Tammy said she and her husband were being supplied with methamphetamine by two Hispanics who were husband and wife, known to her as "Bally" and "Mari." She provided Sgt. Dunn with their cell phone numbers from her phone, which Sgt. Dunn photographed.

Steve said "Bally" had been supplying them for about 1.5 years. "Bally" was subsequently identified as Jerardo Perez. Steve was introduced to him through a co-worker. Steve first dealt with the co-worker's uncle . . . The uncle

6

introduced Steve to Perez, who supplied him since that time. Steve stated that he and Tammy had obtained about one to two ounces of methamphetamine per week for[] $2,100 per ounce since they met Perez, which he estimated had been at least six months to a year. Steve stated that he recalled that Perez had been arrested in Foley and possibly deported as a result. During this time, there was a break in his drug dealings but his wife[,] Mari, subsequently identified as Maria Jose Lopez, began to deliver methamphetamine to them. Tammy said that Lopez delivered one ounce of methamphetamine per week for several months. Tammy stated that she believed Lopez worked at an auto parts store near Foley, and provided a phone number which she believed was the last known working phone number for Lopez.

Both Tammy and Steve told the officers that they continued to purchase ounce quantities of methamphetamine until Todd Gates was arrested near their house a few months prior to the date the search warrant was executed. The officers were aware that Todd Jeffrey Gates had been arrested near the Wilson residence on February 27, 2009.

Tammy told the officers that they began to purchase smaller amounts after Gates' arrest because they were afraid to sell anything to Gates afterwards. From February 27 through July 9, the Wilsons received approximately one or two ounces of methamphetamine every three weeks. The Wilsons stated that they were unable to pay Perez because they were not selling the amount of methamphetamine they once were and they were in debt to him. The reason their business had slacked up was because Gates was not distributing their methamphetamine.

.      .      .

Tammy told the officers that she and Steve also supplied Cecil Rayborn, Jennifer Rayborn, and Theresa Watson.

.      .      .

The Wilsons told the officers that they would cooperate in an investigation involving their suppliers, Lopez and Perez. Tammy told them that they owed their suppliers $2,100 in drug debts. Tammy stated that if they made a controlled buy of drugs from Perez, he would expect her to weigh the drugs in front of him. The next day, Sgt. Dunn returned the black

7

bag containing her scale so that she could use it in her cooperation against Perez.

.    .    .

With regard to the Wilsons' suppliers, [o]n July 12, 2009, the Wilsons received a phone call from Perez telling them he would come to their residence the next day to collect money on the drug debt. Perez informed them that he had an ounce of methamphetamine and he could supply them with some of it.

On July 13, Steve Wilson contacted TFO Reid and told him that Perez had called back and informed him that Perez would come by at about 6:00 p.m. Officers Mosley and Neil Phillips met with TFO Reid at Wilson's residence. They issued the informant prerecorded cash, $1,000, for the deal, along with an electronic scale. TFO Reid established visual surveillance of the residence and situated himself where he could see the front door. At about 5:42 p.m., Officer Phillips contacted T[FO] Reid to tell him that Perez had contacted Steve by direct connect to tell him Perez was about 10 minutes away. At approximately 6:00 p.m., TFO Reid observed a white Ford F-350 arrive, and a Hispanic male got out of the front passenger seat. This subject got out of the vehicle and walked to the rear of the Wilson residence. This subject, subsequently identified as Jerardo Gonzalez Perez, entered the residence and began a conversation with Steve. Steve told Perez that he had recently sold a trailer and he would use that money to pay back the rest of the debt for the methamphetamine. Steve counted out $1,000 in cas[h] and gave it to Perez. Perez counted the money again and told Steve he would provide him with seven grams. Perez also said he was supposed to receive more methamphetamine from his supplier. Perez retrieved a small ziplock baggie from his left front pocket which he gave to Steve. Steve weighed the drugs on the scale, which reflected approximately 7 grams. Perez and Steve engaged in general conversation, and Perez left using the back door.

At about 6:05 p.m., TFO Reid observed as Perez got back into the front passenger seat of the truck. TFO Mosley and TFO Reid followed the truck. The tag displayed on the vehicle came back to Manzano Epigmenio, 19314 County Road 87, Lot 15. The vehicle appeared to be heading toward that address, and TFO requested that a marked patrol unit stop the vehicle to further the investigation.

8

BCSO Deputy Andy Ashton stopped the vehicle. Deputy Ashton identified the driver as Romero Mendez Esteban and Jerardo Gonzalez Perez as the passenger. Esteban did not have a driver[']s license. Sgt. Clint Cadenhead arrived at the scene to assist Deputy Ashton. Deputy Ashton patted down Perez, and emptied his pockets. Sgt. Cadenhead noticed the large amount of cash in Perez's front pocket. Deputy Ashton asked both subject[s] to provide their fingerprints on a latent print card, and he made photographs of a voter's registration card for Esteban. He issued a verbal warning about the window tint of the truck. During the course of the stop, a female arrived at the scene and claimed that the truck belonged to her husband and that Esteban and Perez just started working for her husband's company two days earlier.

TFO Reid retrieved the seven grams of methamphetamine Perez supplied to Steve Wilson at Wilson's house. He submitted it to the DEA South Central Laboratory, where an analysis revealed that the substance was methamphetamine, weighing 6.8 grams.

TFO Reid subpoenaed telephone records for the phone number provided and used by Lopez, Perez and Steve Wilson. From April 15 through August 15, 2009, the records showed 16 cell phone calls and 202 direct connect calls between the phones used by Steve and Perez. The records also showed a call from the phone used by Lopez and Steve Wilson on June 9, 2009 and on July 7, 2009, the Lopez phone called the Perez phone at 9:25 p.m. The records showed that both phones were in the area of Mobile, Alabama, when the call was made. The records showed that the phone used by Tammy Wilson made contact with the phone used by Maria Lopez approximately 32 times from April 4, 2009 through July 14, 2009, and approximately 504 direct connect call were made during the same period between these phones.

TFO Reid obtained this phone number for Maria Lopez as the result of an incident involving a shooting of a subject at her residence, believed to have been Perez. During December of 2009, TFO Reid conducted surveillance at an auto parts store in Foley, as an effort to identify the vehicle described by the Wilson[s] as Lopez's tan Lincoln Navigator. Steve Wilson notified TFO Reid that Lopez worked at that store. TFO Reid observed the vehicle described parked at the store. It displayed Alabama tag 5A42K35, registered to Maria Lopez at 25213-A East Pine Street in Foley.

During the week of January 4, 2010, TFO Reid discovered that a shooting had been reported to the Elberta Police Department at that address. . . . Lopez told the [responding] officers that the male, whom she identified as Fransisco Mendez Mandosa, arrived at the house and was removing "a present" from his vehicle when two Hispanic males approached him, demanding money, and hitting Mendosa with a pistol. When Mendosa gave them $80, one of the men fired a shot in the air. Mendosa and the two suspects entered the residence where Lopez was. Several rounds were fired into the walls of the residence a[nd] Lopez recalled hearing police sirens as the officers responded to the call. The suspects left the residence, but they shot Mendosa in the abdominal area. He was transported by helicopter to Baptist Hospital in Pensacola, Florida. A neighbor provided the officers with surveillance video made by cameras at the neighbor's residence which depicted the subjects fleeing after they shot Mendosa.

Lopez told the officers that Medosa worked for Manzeno Drywall and gave the number of 850-560-0408 as his work number. Lopez provided the officers with her phone number as well, 850-554-4953. This is the phone number that had extensive contact with Tammy Wilson's phone during the time frame indicated in 2009. The vehicle Perez occupied when he delivered the drugs to Wilson on July 13, 2009, was registered in the name of Manzano Epigmenio.

Lopez and Perez each provided a post-Miranda statement when they were arrested on these federal charges. Perez admitted that he sold methamphetamine to the Wilsons and that he had obtained cocaine and methamphetamine from a supplier in Pensacola. He confirmed that he was the one who was shot in December of 2009 at the Pine Street house. Lopez admitted that she was aware of Perez's drug business. When he was deported, she told the officers that she had collected drug money from the Wilsons and that she made a payment on Perez's drug debt to his supplier in Pensacola. She also confirmed that Perez had been shot during the incident on Pine Street in December, and that it could have had something to do with his drug business.

The Government submits that the defendant is accountable for 402.5 grams of methamphetamine mixture as relevant conduct, and that the Government can prove that amount beyond a reasonable doubt.

10

(*Id.* at 1-2, 3-5, 7, 8-10, 10, 10-12, 12, 13 & 17-21.)

On June 23, 2010, Perez entered a counseled blind guilty plea to all substantive counts of the Indictment in which he was charged. (Doc. 172, Guilty Plea Transcript, at 2.)[3]

> THE COURT:     . . . Mr. Gonzalez, what is your full name?
>
> THE DEFENDANT:     Jerardo Perez Gonzalez.
>
> THE COURT:     And how old are you?
>
> THE DEFENDANT:     27.
>
> THE COURT:     How far did you go in school?
>
> THE DEFENDANT:     Middle school in Mexico.
>
> THE COURT:     All right. And have you been treated recently for any mental illness or an addiction to any sort of drug?
>
> THE DEFENDANT:     No.
>
> THE COURT:     Are you currently under the influence of any drug, medication, or alcoholic beverage?
>
> THE DEFENDANT:     No.
>
> THE COURT:     Have you received a copy of the indictment, the written charges pending against you?
>
> THE DEFENDANT:     Yes.
>
> THE COURT:     And have you fully discussed those charges and the case in general with Mr. Stankoski?
>
> THE DEFENDANT:     Yes.

---

[3]     Prior to the start of the colloquy, the interpreter informed United States District Judge Callie V. S. Granade that "the correct form of address would be Gonzalez, not Perez." (*Id.*)

THE COURT:        Do you understand the charges pending against you?

THE DEFENDANT:        Yes.

THE COURT:        Now, I understand that this is a blind plea; is that correct? There's no plea agreement?

MR. STANKOSKI:   That's correct, Judge.

THE COURT:        All right. Has anyone made any promises or assurances to you of any kind in an effort to induce you to plead guilty in this case?

THE DEFENDANT:        No.

THE COURT:        Has anyone attempted in any way to force you to plead guilty?

THE DEFENDANT:        No.

THE COURT:        Are you pleading guilty of your own free will because you are guilty?

THE DEFENDANT:        Yes.

THE COURT:        Do you understand that the offenses to which you are pleading guilty are felony offenses and that if your plea is accepted, you will be adjudged guilty of those offenses and that such adjudication may deprive you of valuable civil rights, if you have them, such as the right to vote, the right to hold public office, the right to serve on a jury, the right to possess any kind of firearm, and it would also entail deportation in your case.  Do you understand those possible consequences?

THE DEFENDANT:        Yes.

THE COURT:        All right. The maximum penalty the Court could impose upon conviction of counts one, 11, and 12 is . . . a minimum of five [years], up to 40 years imprisonment, a fine of up to $2 million, a term of supervised release of up to four years which would follow any term of imprisonment, and a $100 special assessment.

As to count 13, the forfeiture count, will the government be pursuing forfeiture in Mr. Gonzalez' case?

MS. BEDWELL:     We've not identified any property at this time, Your Honor, that is attributable to the defendant, although we might do that by the time of the sentencing. So we'd ask the Court to advise the defendant that forfeiture is a penalty.

THE COURT:     Possibility? Well, under the forfeiture count, if the government identifies any property that constitutes proceeds or was used, instrumental, in your committing these offenses, then you would also be subject to forfeiture of that property. Do you understand those possible consequences of your guilty plea?

THE DEFENDANT:     Yes.

.     .     .

MS. BEDWELL:     Your Honor, I think the penalty as to the substantive offenses is different. . . . Yes, . . . I believe as to counts 11 and 12 the penalty is up to 20 years imprisonment, a fine not to exceed a million dollars, and a supervised release term of up to four years, with the mandatory special assessment as to each of those counts.

THE COURT:     All right. So 11 and 12 have a lesser potential sentence than count one. Do you understand what Ms. Bedwell just stated, Mr. Gonzalez? In other words, count one has a potential sentence of a minimum of five years up to 40 years imprisonment, a $2 million fine, a term of supervised release of four years which would follow any term of imprisonment, and a special assessment of $100.

Counts 11 and 12 have a potential sentence of up to 20 years imprisonment, a $1 million fine, a term of supervised release of three years, and a hundred dollars special assessment for each of those counts. And on both of those or all three of those counts the terms of supervised release, if you violated the conditions of supervised release, you could be in prison for the entire term of supervised release as well. Do you understand those possible consequences of your guilty plea?

THE DEFENDANT:     Yes (nodding head affirmatively).

THE COURT:     Any question about that in your mind?

MR. STANKOSKI:  Judge, we've gone over those, and I was discussing the difference in the penalty versus the guidelines and

13

I've advised him how they play together. And he understood when
we went over it at the jail.

THE COURT:        Is that correct, Mr. Gonzalez?

THE DEFENDANT:        Yes.

THE COURT:        The United States Sentencing Commission
has issued guidelines for judges to consider in determining the
sentence in a criminal case. And Mr. Stankoski stated that you have
been over those guidelines, and is that correct? You have talked
about how the sentencing guidelines might apply to your case?

THE DEFENDANT:        Yes.

THE COURT:        Do you understand that I will not be able
to determine the sentencing guideline range for your case until after
a presentence report has been completed by the probation office and
you and the government have had the opportunity to challenge the
reported facts and the application of the guidelines recommended by
the probation office, and that the guideline range that I determine
applies may be different from any estimate Mr. Stankoski or anybody
else might have given you in this case? Do you understand?

THE DEFENDANT:        Yes.

THE COURT:        Do you also understand that after your
guideline range has been determined, the guidelines themselves
further provide for departures either upwards or downwards from
that range in certain circumstances?

THE DEFENDANT:        Yes.

THE COURT:        And do you understand that, although I
am required to consider the sentencing guidelines, they are advisory
and do not necessarily control the sentence that is imposed?

THE DEFENDANT:        Yes.

THE COURT:        Do you understand that under some
circumstances you or the government may have the right to appeal
any sentence that I impose?

THE DEFENDANT:        Yes.

THE COURT:        Do you understand that you have a right
to plead not guilty to any offense charged against you and to persist

14

in that plea and that you would then have the right to a trial by jury, at that trial you would be presumed to be innocent and the government would have to prove your guilt beyond a reasonable doubt, you would have the right to the assistance of counsel for your defense, the right to see and hear all of the witnesses and have them cross-examined in your defense, the right on your own part to decline to testify unless you voluntarily elected to do so in your own defense, and the right to the issuance of subpoenas to compel the attendance of witnesses to testify in your defense? Do you understand that?

THE DEFENDANT:        Yes.

THE COURT:        And do you also understand that if you went to trial and decided not to testify or to put on any evidence at all, those facts could not be used against you?

THE DEFENDANT:        Yes.

THE COURT:        And do you further understand that by entering a plea of guilty, if that plea is accepted by the Court, there will be no trial and you will have waived or given up your right to a trial as well as those other rights associated with a trial that I've just described?

THE DEFENDANT:        Yes.

THE COURT:        All right. Now you're pleading guilty in counts 11 and 12 to substantive offenses of possession of methamphetamine with intent to distribute it. And in order to convict you of those two counts, the United States would have to prove that you knowingly and willfully on or about the date alleged in the particular count did possess methamphetamine with the intent to distribute it. Do you understand what the government would have to prove as to those two counts?

THE DEFENDANT:        Yes.

THE COURT:        Any question about that?

THE DEFENDANT:        No.

THE COURT:        And as to count one, the conspiracy count, the United States would have to prove that on or about the dates alleged in the indictment you did come to a mutual understanding with at least one other person to unlawfully possess with intent to distribute methamphetamine, and the government

15

alleges that the amount possessed was in excess of 50 grams. Do you understand what the government would have to prove in order to convict you of that offense?

THE DEFENDANT:          Yes.

THE COURT:          All right. Now, the government has provided a copy of a factual resume to the Court which is about 21 pages long. I have read it. But I don't know whether you have read it and whether you agree that the government could prove the facts set forth in that document in order to support your guilty plea. But in order for me to accept your guilty plea, I need to know that there is a factual basis for the plea and that you agreed that the government could prove the facts that would support your guilty plea. Mr. Stankoski, have you been over this factual resume?

MR. STANKOSKI: Yes, ma'am. As it relates to the substantive counts, he would agree that the amounts and the dates he was in possession with the intent to distribute. As it relates to the conspiracy count, we would agree that the government could prove beyond a reasonable doubt that he came to an agreement with others to possess with the intent to distribute the methamphetamine. At this point we don't agree to the drug amount. But we agree to the rest of the factual resume. We hope to, if we enter into a cooperation agreement, we hope to have a signed factual resume. But at this point we're not there yet. But he agrees that they can prove the conspiracy aspect of it beyond a reasonable doubt.

THE COURT:          . . . [Y]ou say you can't agree as to an actual amount. But can you agree that it's in excess of 50 grams?

MR. STANKOSKI:  Yes, ma'am.

THE COURT:          Is that correct, Mr. Gonzalez?

THE DEFENDANT:          All that, no. But – I did cooperate, but not in – by way of selling. But I do plead guilty to conspiracy.

THE COURT:          And to possessing the substantive amounts in counts 11 and 12, as well, with intent to distribute it? . . . I'm talking about the two occasions . . . [o]n count 11 it says on July 9th, 2009, you possessed approximately 7.1 grams of meth with intent to distribute it and on July 13 you possessed approximately seven grams of methamphetamine with intent to distribute it. Do you agree that the government could prove those two offenses as well as the conspiracy?

16

THE DEFENDANT:        Yes.

THE COURT:        I'll now ask you how do you plead to the charge[s], guilty or not guilty?

THE DEFENDANT:        Concerning firearms, I never bore any.

THE COURT:        I'm sorry. I didn't understand the response. The speakers are fuzzy.

THE INTERPRETER:        Excuse me, Your Honor. The defendant's response was: Concerning bearing a firearm, I never did.

THE COURT:        All right. Well, that's not what I'm asking you at this point. I'm asking you whether or not you're pleading guilty or not guilty to the count one, count 11, and count 12.

THE DEFENDANT:        Yes.

THE COURT:        All right. Now, the firearm issue will come in for my consideration at the time of sentencing, and so that's not for me to consider at this point. You understand that?

THE DEFENDANT:        Okay.

THE COURT:        So you are pleading guilty to counts one, count 11, and count 12; is that correct?

THE DEFENDANT:        Guilty.

THE COURT:        All right. It is the finding of the Court in the case of  United States versus Jerardo Gonzalez Perez that the defendant is fully competent and capable of entering an informed plea, that he is aware of the nature of the charges and the consequences of the plea, and that the plea of guilty is a knowing and voluntary plea supported by an independent basis in fact containing each of the essential elements of the offense. The plea is therefore accepted and the defendant is now adjudged guilty of those offenses.

(*Id*. at 3-5, 5, 5-6, 6, 6-11, 11, 11-12, 12 & 12-13.)

The draft Presentence Investigation Report was prepared by the Probation Office

on August 27, 20010 and provided to the parties. (*See* Doc. 234, at 1.) This sealed report

was filed with the Court on August 30, 2010. (*See id.*)[4]  Perez' appointed attorney, J. Clark

Stankoski, Esquire (*see* Doc. 108) filed objections to the presentence report on October 1,

2010 (Doc. 238).

> 1.      At ¶ 78 Specific Offense Characteristic, the Defendant is given a two (2) level enhancement for the possession of a firearm by co-defendants Steven and Tammy Wilson. The Defendant objects to this enhancement as he was unaware that the Wilson[]s['] possessed a firearm(s), and it was unforeseeable for them to be armed. Additionally, the Defendant denies and objects to any reference to the Wilsons working directly for him.

> 2.      At ¶ 80, Adjustment for Role in the Offense, the Defendant objects to a four (4) level enhancement for being the organizer or leader in this conspiracy. The Defendant was merely the supplier and did not manage or organize anything. The Defendant cannot speak English, and the Wilsons do not speak Spanish, so there was no communication between the parties other than price and weight; therefore he took on no other duties other than supplier.

(*Id.* at 1.)[5]

---

[4]      With respect to base offense level, the report provides, as follows: "The guideline for offenses charged under 21 U.S.C. §§ 846 and 841(a)(1) is found at U.S.S.G. § 2D1.1, which provides that the base offense level is determined by the quantity of the controlled substance involved. Pursuant to the Relevant Conduct Standard, U.S.S.G. § 1B1.3, the defendant is to be held accountable for (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; (1)(B) all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity; and (2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) that were part of the same course of conduct or common scheme or plan as the offense of conviction, are included in the calculations for the base offense level. In this case, the defendant is accountable for 402.5 grams of methamphetamine (mixture). Pursuant to U.S.S.G. § 2D1.1(c)(5), offenses involving at least 350 grams, but less than 500 grams of methamphetamine have a base offense level of 30." (Doc. 234, at 22.)   The report reflects a two-level increase, pursuant to U.S.S.G. § 2D1.1(b)(1), "since dangerous weapons were possessed by codefendants Steven and Tammy Wilson, who worked directly" for the defendant and a four-level increase, pursuant to U.S.S.G. § 3B1.1(a), since Perez, as the Wilsons' supplier, "was an organizer or leader of a criminal activity that involved five or more participants[.]" (Doc. 234, at 22 & 23.) Thus, Perez' adjusted offense level was reflected as 36 (*id.* at 23), which was adjusted downward to a 33 due to his acceptance of responsibility and his timely notice to authorities of his intent to enter a guilty plea (*id.* at 23).

A sentencing hearing was conducted on October 15, 2010, during which the following occurred:

> THE COURT:        [] The probation office has determined that the base offense level is a level of 30. It [contains] an adjustment for a gun and an adjustment for a organizer/leader role. With acceptance it brings it to a total offense level of 33. Zero history points for 135 to 168.
>
> There are two objections the first objection is as to a firearm, where he received a two level upward adjustment. Would you like to make any argument other than what you have already made.
>
> MR. STANKOSKI:  No, ma'am.
>
> THE COURT:        You are looking over.
>
> MR. STANKOSKI:  I was under the impression that they were going to call some witnesses.
>
> THE COURT:        As to the firearm.
>
> .        .        .
>
> MS. BEDWELL:       We are prepared to proceed with the Wilsons, who were some of the co-defendants. I spoke to Mr. Stankoski about that

---

[5]        In an addendum to the presentence report, filed under seal on October 8, 2010, the probation officer responded to the defendant's objections. (Doc. 248.)

> Regarding the firearm conduct, once the evidence has established that a firearm was present, it is the defendant's burden to prove that there was no nexus between him and the codefendant's possession of said firearm, to include a lack of reasonable foreseeability by him. Regarding the leadership role, the defendant's wife continued the drug distribution business after the defendant's arrest, and **Perez** appeared to have supervisory authority over her activities. The government indicates that it is prepared to put on evidence in support of these enhancements, for the Court's consideration. These issues are left to the discretion of the Court, and therefore, the presentence report remains unchanged for now.

(*Id*. at 1.) That same date, the probation officer's sentencing recommendation was filed with the Court and recommended a low-end sentence of 135 months (the guideline provisions specifically providing for a sentencing range of 135 to 168 months). (Doc. 249, at 1.)

19

yesterday. So that he would be aware that that is what we intend to do. Should be very brief testimony.

THE COURT:     This should go to your position as organizer/leader.

(Doc. 312, at 2 & 3.) With respect to these two issues, the Assistant United States Attorney presented the testimony of Tammy and Steve Wilson. (*See id.* at 3-27.) Tammy Wilson testified that she had known Perez for a couple of years and that during that time he supplied her husband and her anywhere from one to fourteen (14) grams of methamphetamine on each trip he made to their house to deliver the drug. (*Id.* at 4-5.)[6] According to this witness, Perez also supplied drugs to others (*see id.* at 7 ("He had somebody in Pensacola, Florida.")) and, at times, sent others in his stead to deliver drugs to the Wilsons or pick up money from them (*id.*; *see also id.* at 8 (a Mexican guy in an SUV and "[t]he lady he call his wife.")). "[Maria Lopez] came quite a bit [to deliver drugs or pick up money] when [Perez] was deported until he got back." (*Id.* at 8.) Tammy Wilson also testified that the two guns seized from her home on July 9, 2009, were kept by her husband on the top of his desk, in full view, and that she specifically remembers her husband showing Perez the one gun he had purchased. (*See id.* at 11, 14-15 & 18.)[7] Steve Wilson testified that Perez supplied him with methamphetamine and, further, that the guns seized by police on July 9, 2009, were seized from that place they were normally

---

[6]     Perez, in turn, got the drugs he supplied the Wilsons from two different sources over the course of these two years, one source being located in Arizona and the other in Atlanta. (*See id.* at 5 & 6.)

[7]     Perez' attorney cross-examined Tammy Wilson at length (*see id.* at 15-22) and garnered her admission that she and her husband just purchased drugs from the defendant; Perez did not direct them regarding how to sell or package the methamphetamine (*id.* at 21).

kept on top of his desk. (*Id.* at 24-25.)[8] This witness, however, could not recall whether

Perez saw either of these guns. (*Id.* at 25)

Following the Wilsons' testimony, the court turned first to the firearm issue. (*See*

*id.* at 28-31.)

> THE COURT:    All right. Under U.S. versus Surez (phonetic)
> which is a[n] 11th Circuit case from 2002[,] 313 F 3rd 1287, the government
> must prove by a preponderance of the evidence that the possessor of the
> firearm was a coconspirator. They have done that.
>
> That the possession was in furtherance of the conspiracy. That the
> defendant was a member of the conspiracy at the time of the possession.
> The defendant has plead[ed] guilty to that element. The coconspirator
> possession was reasonably foreseeable by the defendant. I believe the
> government has shown that. Based on the testimony of Mr. and Mrs. Wilson
> that it was there and obvious when he was in the room.
>
> The issue that obviously just stuck its head up was that the
> possession was in furtherance of the conspiracy. I would hear from Ms.
> Bedwell on any legal argument you make about that.

(*Id.* at 28-29.) Following the arguments of counsel on the firearms issue (*id.* at 29-31), the

Court then extended counsel the opportunity to make arguments regarding the

organizer/leader role issue (*id.* at 31 ("I will tell you the factors that I am considering.

And th[ose] are the exercise of decision making authority, the nature of the participation

in the commission of the offense, the recruitment of accomplices, the claimed right to a

larger share of the fruits of the crime, the degree of participation in planning or

organizing the offense and the nature and scope of the illegal activity and the degree of

control and authority [] exercised over others. Those are the factors to be considered in

determining if he should get an aggravating role or a mitigation role or if he is just an

---

[8]      Wilson testified he had the weapons not for personal protection (*id.* at 27) but,
instead, simply to address the problems he and his family were experiencing with "coyotes" (*id.*
at 26-27).

average participant.")), and upon hearing such arguments (*id*. at 31-36), the district judge

entered her rulings with respect to both enhancement issues (*see id*. at 36-37).

THE COURT:        Okay. As to the firearm, the Court finds that the relatively low standard that is required when the codefendant possesses a firearm is met in this case, based on the fact that the firearms were present during – apparently during the drug transactions that would occur [] – in the trailer. Whereas Mr. Wilson said the purpose was to sho[o]t coyotes. It may not have been his intent to ever use them for himself. They were out and visible during the drug transactions, which is I think exactly what the Congress and the guidelines are directed toward, and that it heightens the dangerousness level when guns are present out and open during a drug transaction. And because of the codefendant's liability under the case law the defendant is charged with that adjustment.

As far as the organizer/leader[/]manager[/]supervisor, trying to sort out this conspiracy, it's often difficult because we have various players. You know, the drugs come in from somewhere. They are sold. This supplier sells them to this supplier and finally they reach the street to users. But trying to distinguish between the different players is often very hard. I do not find that he was the kingpin or the ultimate leader/organizer in this. Obviously he was getting it from someone else and then supplying the amount. But the large amounts that he was supplying though and on a weekly basis, I believe qualifies him for a manager supervisor role because he was managing and supervising at least his wife and perhaps one other person who was sent as a courier one occasion. And because of that I find that a three level aggravating role is called for. I think that would change it then to a total offense level of 32 for a guideline range of 121 to 151.

Any other objections?

MR. STANKOSKI:   Nothing further.

THE COURT:        Okay. Do you have any witnesses or anything you would like to say on your client's behalf? . . .

MR. STANKOSKI:   No, ma'am, not unless he wants to address you.

THE COURT:        Mr. Perez, would you like to say anything? You are not required to but before I impose sentence would you like to say anything?

INTERPRETER:     Yes.

.        .        .

First of all I would like to ask the forgiveness of everyone in this Court, of the United States and the people. I am extremely repentant of this mistake that I have made. But would also like everyone to know that I'm not guilty of everything that the people are saying about me. I came in here since the year 1999. I always worked very hard to be able to help my family out. I have never been involved with drug dealing. And I have never been close to people who were dedicated to the sell of drugs or consumers.

.    .    .

What I would like to request . . . [is] that you please not be to[o] harsh on me. Give me an opportunity. I know that in your eyes I am a bad man. But I am really not a bad person. I did allow myself to be governed by my addiction. And I would simply request that you not be too harsh on me. Give me some opportunity to be able to help my children out. If I am deported I promise that I will not return. And that is really all and please I ask for your forgiveness. And I would like you all to consider that what is being said of me is not true. I don't belong to any organization nor do I manage quantities of drugs.

And that's all. Thank you.

.    .    .

THE COURT:        All right. Ms. Bedwell?

MS. BEDWELL:        Your Honor, we submit that a sentence within the guideline range is one that is appropriate under the facts and circumstances of this case in light of the sentencing factors that the Court has to consider the government submits that the nature and seriousness of this offense is one that calls for a sentence within the guideline range in this case. And the Court is very aware of the horrible consequences of methamphetamine distribution and abuse in this community. This crime is one that calls for serious punishment on those that distribute the drugs and particularly a person of the defendant's background and characteristics. He has been in the country illegally, been deported, returned to continue ongoing illegal activity. Under all of these circumstances we submit that would be a reasonable sentence.

MR. STANKOSKI:  Judge, the only thing I wanted to point out was during his allocution when he is saying he wasn't guilty of doing some of these things, what I think he is referring to, and some of it gets lost in translation, is the fact that if a codefendant has a gun that he is also going to be culpable for the gun and the same for the organizer leader. He has never wavered and denied he did this and he was guilty of it.

THE COURT:        All right. Well, first of all the seriousness of the offense is this was and extensive drug bringing lots of methamphetamine into the State of Alabama. One of the issues that I am to weigh is the likelihood of recidivism. And one thing that stand[s] out to me is that he was arrested in December and deported. He was back within at least a couple of months, and participating in the same activity. But, again, that would show a high level of recidivism likelihood.

Also I weigh that against the fact that he has no convictions that gave him any criminal history points.

But considering the evidence that I have heard about this conspiracy and the extensiveness of this conspiracy and his ability to get large quantities, I do believe that guideline sentence is an appropriate sentence. But I'[ll] sentence at the bottom of the guideline range because of his lack of criminal history thus far. If you will stand I will read your sentence.

Pursuant to the sentencing reform act it's the judgment of the Court that the defendant Jerardo Gonzalez Perez is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 121 months as to each count one, 11, [and] 12. Said term to be served concurrently in an institution where the Residential Comprehensive Substance Abuse Treatment Program is available.

For purposes of that I want to put on the record that although he was given a tw[o] level adjustment for the gun, it was based not on his possession of a gun but on the coconspirator liability theory. And that had the Court had to make a determination there would not be a determination that he possessed a gun. I don't know if that w[i]ll assist him but that is the Court's finding.

Upon release [from] imprisonment the defendant shall be placed [on] supervised release for a term of 4-years as to Count 1, 3 years on Counts eleven and 12 and all terms to run concurrent.

Immediately after incarceration and as a special condition of supervised release the defendant is to be delivered to a duly authorized immigration official for deportation consideration. If deported you are to remain outside the United States. If you are not deported you are to report to the probation office in the district to which you are released. While on supervised release you shall not commit federal, state or local crimes and you are prohibited from possessing a firearm or other dangerous device and shall not possess a controlled substance. In addition you shall comply with the standard condition[s] of supervised release.

When you are released if you are not deported you are going to participate in drug treatment and testing as directed by the probation office.

24

The Court finds that you do not have the ability to pay a fine, so a fine is not imposed.

I find the advisory guideline range is appropriate for the reasons already stated.

It is order[ed] that you pay a special assessment in the amount of a hundred dollars as to Count One, 11 and 12 for a total of $300, which is [] due immediately.

I will hear your objection[s]?

MR. STANKOSKI:   I have no further objections, other than the ones I have already raised.

.      .      .

THE COURT:       Remanded to the custody of the marshals. Count 13 to be dismissed?

MS. BEDWELL:     So moved.

THE COURT:       Dismissed.

(*Id*. at 36-38, 38, 38-39, 39, 39-40, 40-44 & 44.)

Perez filed written notice of appeal on October 26, 2010 (Doc. 281) and final judgment was entered by this Court on November 1, 2010, committing Perez to the custody of the United States Bureau of Prisons for a term of 121 months as to Counts 1, 11, and 12, said terms to run concurrently (Doc. 286, at 2).

On November 29, 2011, the Eleventh Circuit issued an unpublished opinion affirming Perez' sentences. (Doc. 408.)[9]

On June 23, 2010, Jerardo Gonzales Perez pled guilty to three counts of a twelve-count indictment: Count One, conspiracy to possess with intent to distribute methamphetamine, in violation of 21 U.S.C. § 846, and Counts Eleven and Twelve, possession of methamphetamine with intent to

---

[9]      The judgment was issued as mandate on February 1, 2012. (Doc. 413.)

distribute on two separate days, in violation of 21 U.S.C. § 841(a)(1). On November 1, 2010, the district court sentenced Perez to concurrent prison terms of 121 months. He now appeals his sentences.

Perez argues that the district court, in determining his total offense level under the Sentencing Guideline applicable to his offenses, U.S.S.G. § 2D1.1, erred in enhancing the base level pursuant to U.S.S.G. § 2D1.1(b)(1), for possession of a firearm by his codefendants, and U.S.S.G. § 3B1.1(a), for his role as a manager or supervisor in the offense. He therefore asks that we vacate his sentences and remand for resentencing pursuant to a Guidelines sentence range determined without reference to these enhancements. We find no error and accordingly affirm.

Perez argues that the § 2D1.1(b)(1) enhancement was inappropriate because his purported possession of a firearm via his codefendants was neither reasonably foreseeable nor in furtherance of the conspiracy. Section 2D1.1(b)(1) provides that, if a defendant possessed a dangerous weapon— two handguns in this case—during a drug-trafficking offense, his offense level should be increased by two levels. This enhancement is applied when such weapon is possessed by a co-conspirator if the Government proves by a preponderance of the evidence that: (1) the possessor of the weapon was a co-conspirator; (2) the possession was in furtherance of the conspiracy; (3) the defendant was a member of the conspiracy at the time of possession; and (4) the co-conspirator's possession was reasonably foreseeable by the defendant. *United States v. Gallo,* 195 F.3d 1278, 1284 (11th Cir. 1999). The commentary to § 2D1.1(b)(1) states that the enhancement should be applied if the weapon was present, unless it is clearly improbable that it was connected to the offense. U.S.S.G. § 2D1.1(b)(1), comment. (n.3).

To prove that possession was in furtherance of the conspiracy, the Government need only show by a preponderance of the evidence that the weapon was present at the site of the charged offense, unless it was clearly improbable that it was connected with the offense. *United States v. Fields,* 408 F.3d 1356, 1359 (11th Cir. 2005). Once the Government shows that a weapon was present, the burden shifts to the defendant to show that a connection between the weapon and the offense is clearly improbable. *Id.*

With regard to the reasonable foreseeability prong of *Gallo,* we have recognized that handguns are a tool of the drug trade, and that there is a frequent and overpowering connection between their use and narcotics trafficking. *Pham,* 463 F.3d at 1246. To this end, we have found it reasonably foreseeable that a co-conspirator would possess a firearm where the conspiracy involved trafficking in lucrative and illegal drugs. *Fields,* 408 F.3d at 1359. We have also upheld application of the § 2D1.1(b)(1) enhancement even where the defendant claims he was unaware of the firearm possession. *United States v. Pham,* 463 F.3d 1239, 1246 (11th Cir. 2006).

In this case, the Government proved that the handguns were connected to the charged offenses and that their use by a co-conspirator was reasonably foreseeable. *Id*. And Perez failed to show that a connection between the handguns and the offense was clearly improbable. The § 2D1.1(b)(1) enhancement was therefore appropriate.

Perez argues that the § 3B1.1(b) enhancement was inappropriate because the evidence was insufficient to prove that he managed or supervised another person in connection with the occurrence of the offenses for which he pled guilty. Section 3B1.1(b) instructs the district courts to increase a defendant's offense level by three levels if the defendant was a manager or supervisor (but not an organizer or leader) of the offense, and the criminal activity involved five or more participants or was otherwise extensive. The Government bears the burden of proving by a preponderance of the evidence that the defendant played such a role in the offense. *United States v. Glinton*, 154 F.3d 1245, 1260 (11th Cir. 1998). In determining the defendant's role in the offense, the district court should consider the following factors:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, comment. (n.4). There is no requirement that all the considerations must exist in any one case. *United States v. Ramirez*, 426 F.3d 1344, 1356 (11th Cir. 2005). The defendant need only manage or supervise one other participant for the enhancement to apply. U.S.S.G. § 3B1.1, comment. (n.2). The Government is not required to prove that the defendant controlled another participant. *United States v. Matthews,* 168 F.3d 1234, 1250 (11th Cir. 1999).

Given the uncontested factual statements in the presentence investigation report and the testimony presented at Perez's sentencing hearing concerning Perez's direction of his courier, Maria Lopez, we conclude that the Government satisfied its burden of proof and that the court could reasonably find that Perez occupied a managerial role in the offense. Accordingly, no error occurred in the court's application of U.S.S.G. § 3B1.1(b).

AFFIRMED.

(*Id.* at 1-5.)

27

Perez filed the instant motion to vacate, pursuant to 28 U.S.C. § 2255, on August 29, 2012. (Doc. 422, at 14 (date placed in the prison mailing system).) Therein, petitioner raised the following claims of alleged ineffective assistance of counsel: (1) counsel failed to object to and file a motion to dismiss the indictment for failure to state an offense and/or to the constitutional validity of the indictment; (2) counsel failed to object to the inconsistencies in the Wilsons' testimony with regard to his knowledge of the guns found in the Wilsons' home; and (3) counsel failed to object to the Court's three-level-enhancement applied to petitioner as a manager/supervisor.

The United States filed its response in opposition on October 1, 2012 and therein contends that petitioner's claims of ineffective assistance of trial counsel "are due to be denied as factually false, improperly pled, precluded by the law of the case doctrine, or lacking in prejudice." (Doc. 424, at 1; *see also id*. at 2-28.)[10]

In addition to replying to the government's response on October 22, 2012 (Doc. 425, at 9-15), petitioner also raised two additional claims of ineffective assistance of counsel, namely that counsel: (1) failed to object to the Court's violation of Rule 11(c)-(f) during his guilty plea proceeding; and (2) failed to object to the constructive amendment of the indictment (*see id*. at 1-9).

## CONCLUSIONS OF LAW

Section 2255 reads, in relevant part, as follows: "A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon

---

[10]      As noted by the government in its reply, petitioner appears to have raised an additional claim of ineffective assistance of counsel in his affidavit attached to his § 2255 motion, namely that counsel failed to raise at his sentencing hearing information that the Wilsons were being supplied narcotics, not only by him but, as well, by another individual named "Odelle." (*See* Doc. 422, Affidavit of Jerardo Gonzalez Perez, at ¶¶4-8.)

the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).

In this instance, Perez contends that constitutionally ineffective assistance of counsel entitles him to the relief afforded by 28 U.S.C. § 2255.[11] In order to establish a claim of ineffective assistance of counsel, a petitioner is required to show (1) that his attorney's representation fell below "an objective standard of reasonableness" and (2) that a reasonable probability exists that but for counsel's unprofessional conduct, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "The petitioner bears the burden of proof on the 'performance' prong as well as the 'prejudice' prong of a *Strickland* claim, and both prongs must be proved to prevail." *Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001), *cert. denied sub nom. Johnson v. Nagle*, 535 U.S. 926, 122 S.Ct. 1295, 152 L.Ed.2d 208 (2002).[12] The *Strickland v. Washington* standard for evaluating claims of ineffective

---

[11]      Once a criminal defendant enters a guilty plea, he waives all non-jurisdictional challenges to the conviction's constitutionality and only an attack on the voluntary and knowing nature of the plea can be raised. *See McMann v. Richardson*, 397 U.S. 759, 772, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970). Stated differently, "a voluntary and intelligent plea made by an accused person, who has been advised by **competent counsel**, may not be collaterally attacked." *Mabry v. Johnson*, 467 U.S. 504, 508, 104 S.Ct. 2543, 2546-2547, 81 L.Ed.2d 437 (1984) (emphasis supplied). Therefore, when a § 2255 motion is filed collaterally challenging convictions obtained pursuant to guilty pleas, "the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary." *United States v. Broce*, 488 U.S. 563, 569, 109 S.Ct. 757, 762, 102 L.Ed.2d 927 (1989).

[12]      It is proper in considering claims made by a federal prisoner under § 2255 to look for guidance from cases discussing claims raised by state prisoners under 28 U.S.C. § 2254. *See* (Continued)

assistance of counsel was held applicable to guilty pleas in *Hill v. Lockhart*, 474 U.S. 52, 58,

106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985).

> To succeed on such a claim, "the defendant must show that counsel's
> performance was deficient.  This requires showing that counsel made errors
> so serious that counsel was not functioning as the 'counsel' guaranteed the
> defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668,
> 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).[13]  In addition, the defendant
> must establish that "counsel's constitutionally ineffective performance
> affected the outcome of the plea process." *Hill*, 474 U.S. at 59, 106 S.Ct. at
> 370.  In other words, . . . [a petitioner] "must show that there is a reasonable
> probability that, but for counsel's errors, he would . . . have pleaded [not]
> guilty and would . . . have insisted on going to trial." *Hill*, 474 U.S. at 59,
> 106 S.Ct. at 370.

*Coulter v. Herring*, 60 F.3d 1499, 1504 (11th Cir. 1995) (footnote, brackets and ellipses

added), *cert. denied sub nom. Coulter v. Jones*, 516 U.S. 1122, 116 S.Ct. 934, 133 L.Ed.2d 860

(1996). Indeed, in the guilty-plea context, the Eleventh Circuit has held that "'counsel

owes a lesser duty to a client who pleads guilty than to one who decides to go to trial,

and in the former case counsel need only provide his client with an understanding of the

law in relation to the facts, so that the accused may make an informed and conscious

choice between accepting the prosecution's offer and going to trial.'" *Carter v. United

States*, 288 Fed.Appx. 648, 649 (11th Cir. Aug. 4, 2008),[14] quoting *Wofford v. Wainwright*,

---

*Hagins v. United States,* 267 F.3d 1202, 1205 (11th Cir. 2001) (citing *Holladay v. Haley*, 209 F.3d 1243
(11th Cir. 2000)), *cert. denied*, 537 U.S. 1022, 123 S.Ct. 545, 154 L.Ed.2d 432 (2002).

[13]   "When analyzing ineffective-assistance claims, reviewing courts must indulge a
strong presumption that counsel's conduct fell within the wide range of reasonably professional
assistance." *Smith v. Singletary*, 170 F.3d 1051, 1053 (11th Cir. 1999) (citations omitted).

[14]   "Unpublished opinions are not considered binding precedent, but they may be
cited as persuasive authority." 11th Cir. R. 36-2.

748 F.2d 1505, 1508 (11th Cir. 1984).[15] Moreover, in the context of sentencing following entry of a guilty plea the court simply considers whether petitioner has established, in accordance with *Strickland, supra*, that his attorney was deficient and that he was prejudiced by this deficiency in performance. *See, e.g., Myers v. United States,* 2009 WL 1505638, *1 (W.D. Pa. 2009) ("In order for petitioner to succeed on an ineffective assistance of counsel claim, he must prove: (1) that his counsel was deficient; and (2) that he was prejudiced by his counsel's deficiency."), *aff'd,* 364 Fed.Appx. 769 (3rd Cir. 2010), *cert. denied,* ___ U.S. ___, 131 S.Ct. 1026, 178 L.Ed.2d 848 (2011).

When applying the *Strickland* standard, it is clear that courts "are free to dispose of ineffectiveness claims on either of its two grounds."  *Oats v. Singletary,* 141 F.3d 1018, 1023 (11th Cir. 1998) (citation omitted), *cert. denied sub nom. Oats v. Moore,* 527 U.S. 1008, 119 S.Ct. 2347, 144 L.Ed.2d 243 (1999); *see also Butcher v. United States,* 368 F.3d 1290, 1293 (11th Cir. 2004) ("[O]nce a court decides that one of the requisite showings has not been made it need not decide whether the other one has been.").

Before addressing the merits of any of petitioner's claims of ineffective assistance of counsel, the undersigned need reiterate that "[a] defendant who enters a plea of guilty waives all nonjurisdictional challenges to the constitutionality of the conviction, and only an attack on the voluntary and knowing nature of the plea can be sustained." *Wilson v.*

---

[15]     Thus, "'the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between.'" *Johnson, supra,* 256 F.3d at 1176 (citation omitted).

*United States*, 962 F.2d 996, 997 (11th Cir. 1992) (citation omitted).[16] This waiver includes claims of ineffective assistance of counsel that do not implicate the decision to plead guilty. *Wilson, supra,* at 997; *see also Smith v. Estelle*, 711 F.2d 677, 682 (5th Cir. 1983) ("Smith's guilty plea was voluntary and knowingly made, [thus] he cannot now attack the ineffectiveness of his counsel in any respects other than as the alleged ineffectiveness bears upon counsel's faulty advice that coerced a guilty plea."), *cert. denied sub nom. Smith v. McKaskle*, 466 U.S. 906, 104 S.Ct. 1685, 80 L.Ed.2d 159 (1984); *Williams v. United States,* 2011 WL 3268308, *2 (M.D. Fla. Aug. 1, 2011) ("Williams is barred from raising a challenge to the factual basis of his plea in a 28 U.S.C. § 2255 motion either directly or disguised as a claim of ineffective assistance of counsel."). As established by the record, Perez' guilty plea was knowingly and voluntarily entered.[17] Therefore, Perez has waived

---

[16]     In other words, when a defendant enters a plea of guilty, as Perez did here, he waives "all but jurisdictional claims up to the time of the plea." *Saldrriaga-Palacio v. United States,* 2008 WL 686940, *3 (M.D. Fla. Mar. 12, 2008), citing *Tollett v. Henderson,* 411 U.S. 258, 266-267, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973).

[17]     To determine that a guilty plea is knowing and voluntary, a district court must comply with Rule 11 and address its three core concerns: "ensuring that a defendant (1) enters his guilty plea free from coercion, (2) understands the nature of the charges, and (3) understands the consequences of his plea." *United States v. Moriarty*, 429 F.3d 1012, 1019 (11th Cir. 2005) (citation omitted). As set out in the lengthy findings of fact, the Court confirmed during the Rule 11 colloquy that the plea was free from coercion, and that Perez understood the nature of the charges and the consequences of his plea. Petitioner's representations during the plea proceeding, along with those of his lawyer and the prosecutor, and the findings by the Court when accepting the plea, "constitute a formidable barrier in any subsequent collateral proceedings." *Blackledge v. Allison*, 431 U.S. 63, 73-74, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977); *see also Thompson v. Wainwright*, 787 F.2d 1447, 1460 (11th Cir. 1986) ("'[T]he representations of the defendant [at a plea hearing] as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings.'"), *cert. denied sub nom. Thompson v. Dugger*, 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 825 (1987). Indeed, "[t]here is a strong presumption that the statements made during the [plea] colloquy are true[,]" *United States v. Medlock*, 12 F.3d 185, 187 (11th Cir.), *cert. denied*, 513 U.S. 864, 115 S.Ct. 180, 130 L.Ed.2d 115 (1994), and, consequently, a defendant bears a "heavy burden" to show that his statements under oath were false, *United States v. Rogers*, 848 F.2d 166, 168 (11th Cir. 1988) (citation omitted). In this case, there can be no doubt but that Perez' plea of guilty is in fact lawful in that it was entered in accordance with applicable constitutional principles. Stated differently, this Court correctly (Continued)

determined that Perez' guilty plea was made knowingly, intelligently, and voluntarily and that his plea was supported by an independent basis in fact of the essential elements of the offenses.

Not surprisingly, therefore, the Court should reject petitioner's post-motion "supplemental" argument that counsel erred in failing to object to the court's violation of Rule 11(c)-(f) during his guilty plea proceeding. (*See* Doc. 425, at 2-6.) At the outset, the undersigned notes that Federal Rule of Criminal Procedure 11(c) outlines the plea agreement procedure and since there was no plea agreement in this case, the Court obviously could not have violated this paragraph of Rule 11 and counsel was without a basis to make any objection thereto. Moreover, Perez nowhere directly explains how the Court violated paragraphs (d) (withdrawing a guilty plea), (e) (finality of guilty plea), or (f) (admissibility or inadmissibility of a plea, plea discussions, and related statements) and, therefore, has no basis to suggest that counsel was deficient in failing to object on these specific bases. Looking more closely at petitioner's argument in this regard, he appears to be arguing that the Court failed to advise him of certain constitutional rights he was waiving by entering his plea, including the right to a jury trial, the right to counsel, the right to question government witnesses, the right to present evidence on his own behalf, and the protection against self-incrimination. (*See* Doc. 425, at 2.) However, this statement is patently false as during the course of the guilty plea colloquy, the following occurred:

> THE COURT:  Do you understand that you have a right to plead not guilty to any offense charged against you and to persist in that plea and that you would then have the right to a trial by jury, at that trial you would be presumed to be innocent and the government would have to prove your guilt beyond a reasonable doubt, you would have the right to the assistance of counsel for your defense, the right to see and hear all of the witnesses and have them cross-examined in your defense, the right on your own part to decline to testify unless you voluntarily elected to do so in your own defense, and the right to the issuance of subpoenas to compel the attendance of witnesses to testify in your defense? Do you understand that?

> THE DEFENDANT:          Yes.

> THE COURT:  And do you also understand that if you went to trial and decided not to testify or to put on any evidence at all, those facts could not be used against you?

> THE DEFENDANT:          Yes.

> THE COURT:  And do you further understand that by entering a plea of guilty, if that plea is accepted by the Court, there will be no trial and you will have waived or given up your right to a trial as well as those other rights associated with a trial that I've just described?

> THE DEFENDANT:          Yes.

(Doc. 172, at 9.) Accordingly, counsel had nothing to object to in this regard and was not deficient for failing to assert a patently frivolous objection.

33

all claims of ineffective assistance of counsel raised in his § 2255 motion that do not

implicate the validity of the plea itself, *Wilson, supra,* namely that counsel was ineffective

in failing to attack the indictment for failure to state an offense[18] and counsel's failure to

_____

[18]    Even if this claim of ineffective assistance of counsel has not been waived, petitioner cannot prevail because he can establish neither *Strickland* prong. Looking more closely at this claim, it is clear the Perez contends that counsel should have challenged Counts 11 and 12 for failing to state offenses because those counts merely stated he possessed certain amounts of methamphetamine on certain days but failed to alleged that he possessed those amounts "***with intent to distribute.***" (*See* Doc. 422, Attachment, at 6-7; *compare id. with* Doc. 1, at 5.)   Although Counts 11 and 12 of the indictment did not include the foregoing highlighter words, both counts specifically referenced 21 U.S.C. § 841(a)(1) (Doc. 1, at 5), which provides that "it shall be unlawful for any person knowingly or intentionally [] to manufacture, distribute, or dispense or possess with intent to manufacture, distribute, or dispense, a controlled substance[.]"   It is well established in the Eleventh Circuit that "when the indictment specifically refers to the statute on which the charge was based, the statutory language may be used to determine whether the defendant received adequate notice." *United States v. Chilcote*, 724 F.2d 1498, 1505 (11th Cir.) (citations omitted), *cert. denied*, 467 U.S. 1218, 104 S.Ct. 2665, 81 L.Ed.2d 370 (1984); *see also United States v. Pena*, 684 F.3d 1137, 1147 (11th Cir. 2012) ("'If an indictment specifically refers to the statute on which the charge was based, the reference to statutory language adequately informs the defendant of the charge.'"), *cert. denied*, 2013 WL 57151 (Jan. 7, 2013).   In this case, the indictment's explicit reference in Counts 11 and 12 to §841(a)(1) put Perez on notice of all the elements of the possession with intent to distribute offense, including the "intent to distribute" requirement, *see United States v. McGarity*, 669 F.3d 1218, 1237 (11th Cir. 2012) ("The fact that Count One does not specifically state that the defendants acted 'in concert with three or more persons' does not render the indictment insufficient; the indictment's explicit reference to § 2252A(g) put the defendants on notice as to all of the elements of the CEE offense, including the 'in concert' requirement."), particularly when this requirement can be inferred from Count One of the indictment—which petitioner admits constitutionally informed him of the offense charged (Doc. 422, Attachment, at 5 ("Petitioner contends that Count One which charged him with 'Conspiracy to possess with intent to distribute Methamphetamine', in violation of Title 21 U.S.C. § 841(a)(1), 846, and 18 U.S.C. § 2, clearly and constitutionally stated and informed Petitioner of the charge under § 841(a)(1), 846, because as the count (charge) reads, the offense was (§841(a)(1)) 'Possess with intent to distribute.'"))—charging him with conspiracy to possess ***with intent to distribute*** methamphetamine, *see Pena, supra,* at 1148 n.8 ("[W]e hold that where, as here, the sufficiency of the indictment is raised for the first time on appeal, the court can consider the content of other counts of the indictment in order to give context to the challenged count so long as the defendant fails to show actual prejudice resulting from the indictment's failure to expressly incorporate other paragraphs into the challenged count."). Based on the contents of Count One, plaintiff knew he was pleading guilty to possessing with intent to distribute 7 grams of methamphetamine on July 9, 2009, and another 7.1 grams of methamphetamine on July 23, 2009, in violation of 21 U.S.C. § 841(a)(1). Accordingly, petitioner's attorney was simply not unconstitutionally deficient in failing to interpose an objection to Counts 11 and 12 of the indictment.

(Continued)

34

object to the Court's constructive amendment of the indictment during the guilty plea and sentencing proceedings (*see* Doc. 425, at 6-9).[19]

Petitioner's final two arguments relate to his appointed attorney's performance during the sentencing hearing. *See Wilson, supra,* 962 F.2d at 997 ("A defendant has a constitutional right to effective assistance of counsel at sentencing."). Perez contends that counsel erred in failing to "object" to the inconsistencies in the Wilsons' testimony with regard to his knowledge of the guns in the Wilsons' residence, as well as the "relation" of petitioner to those guns (Doc. 422, Attached Memorandum, at 10-19), and also contends that counsel erred in failing to object to the Court's three-level-enhancement for his role as a manager/supervisor (*see id.* at 19-23). These ineffective assistance of counsel claims simply have no merit. As is apparent from a perusal of the Eleventh Circuit's unpublished memorandum opinion, Perez was unable to persuade that court that the evidence failed to support sentence enhancements for gun possession by a co-conspirator and for his role as a manager or supervisor in the offense. (Doc. 408, at 2-5.) Consequently, Perez simply cannot establish that his counsel's alleged failure to "object"

---

Additionally, petitioner cannot establish that he was prejudiced by counsel's failure in this regard given his admission that Count One of the indictment sufficiently apprised him of an offense and the fact that his sentences as to Counts 11 and 12 were made to run concurrent with his Count One sentence.

[19]    It is petitioner's argument that counsel should have objected when the Court "constructively amended" the indictment during the guilty plea and sentencing proceedings by stating that Counts 11 and 12 charged him with possessing "***with intent to distribute***" certain amounts of methamphetamine. (*Compare* Doc. 425, at 6-9 *with* Doc. 172, at 12.) The previous analysis applies equally to this argument and establishes that counsel was not deficient in any manner for failing to object as petitioner suggests. In other words, the undersigned's previous determination that Counts 11 and 12 of indictment sufficiently notified Perez that he was being charged in these two counts with possessing with intent to distribute methamphetamine forecloses any argument that counsel should have objected to the Court "constructively amending" these two counts of the indictment.

to inconsistencies in the Wilsons' testimony[20] or to the three-level-enhancement for his

role as a manager/supervisor[21] fell below an objective standard of reasonableness and

prejudiced his case.[22]

---

[20]     The undersigned would simply note that petitioner's attorney argued that the gun enhancement should not be applied to Perez and in making that argument counsel specifically pointed to Tammy Wilson's testimony that she and her husband were not fearful of petitioner, that her husband was the owner of the guns and according to Steve Wilson, the guns were purchased for their "coyote" problem, nothing else. (Doc. 312, at 30; *see also id.* ("I think that speaks for itself.").) Accordingly, Stankoski specifically argued at sentencing—contrary to how petitioner now attempts to cast that argument (*see* Doc. 422, Attachment, at 14-17)—that there was no connection between the drugs and the guns since the guns were kept only to address a "coyote problem." Moreover, Stankoski cross-examined Tammy Wilson at length to try to cast doubt on her testimony that Perez had seen the guns at their residence during the course of supplying them with methamphetamine. (*See id.* at 15-22.) The bottom line is that petitioner's attorney "objected" to application of the two-level-enhancement for gun possession by a co-conspirator and, therefore, this Court should eschew Perez' attempt to confuse the issue by arguing that his attorney failed to "object" to inconsistencies in testimony given at the sentencing hearing.

[21]     Petitioner contends that the Court stated the factors applicable based on the role of "organizer/leader" but then applied the "manager/supervisor" role to petitioner without objection from his attorney. (*See* Doc. 422, Attachment, at 19-23.) At the outset, the undersigned notes that the "factors" identified by the Court do not simply relate to the "organizer/leader" role (*compare* Doc. 312, at 31 ("I will tell you the factors that I am considering. And the[y] are the exercise of decision making authority, the nature of the participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense and the nature and scope of the illegal activity and the degree of control and authority . . . exercised over others. ***Those are the factors to be considered in determining if he should get an aggravating role or a mitigation role or if he is an average participant***." (emphasis supplied)) *with* U.S.S.G. § 3B1.1, Commentary, n.4 ("*In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as 'kingpin' or 'boss' are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.*" (emphasis in original)). Moreover, what petitioner neglects to point out is that the government sought a four-level-enhancement based on petitioner's role as an "organizer/leader" (*see* Doc. 312, at 2; *compare id. with* Doc. 234, at 23 ("Pursuant to U.S.S.G. § 3B1.1(a), since the defendant was an organizer or leader of a criminal activity that involved five or more participants, or was otherwise extensive, the offense is increased four levels.")), to which his attorney interposed written objection (Doc. 238 (characterizing petitioner as merely a supplier)), and that after the Court specifically determined the "organizer/leader" role did not apply but that the "manager/supervisor" role did apply (Doc. 312, at 37), Stankoski steadfastly maintained on appeal—as he did during the sentencing hearing (*see* Doc. 312, at 34-35 ("I am going specifically under the commentary is when looking at those four things: The nature of the participation, I think we have covered that; the recruitment of accomplices; the only thing that has (Continued)

In consideration of the foregoing, the Magistrate Judge recommends that the Court deny Perez' motion to vacate, set aside or correct his sentence under 28 U.S.C. § 2255. Petitioner is not entitled to an evidentiary hearing in this case because his allegations are either affirmatively contradicted by the record or, otherwise, even taking the facts he states as true, same would not entitle him to relief. *Aron v. United States*, 291 F.3d 708, 714-715 (11th Cir. 2002) ("[I]f the petitioner 'alleges facts that, if true, would entitle him to relief, then the district court should order an evidentiary hearing and rule on the merits of his claim.' . . . Although we have stated that a district court is not required to hold an evidentiary hearing where the petitioner's allegations are affirmatively contradicted by the record, or the claims are patently frivolous, no such circumstances are present here." (internal citations omitted)); *see also United States v. Bejacmar*, 217 Fed.Appx. 919, 921 (11th Cir. Feb. 15, 2007) ("[I]f the petitioner's allegations are affirmatively contradicted by the

---

been testified to is by Ms. Wilson, coconspirator, saying some guy in an SUV that was nicely painted, and Ms. Lopez. Ms. Lopez was charged as a coconspirator and I believe she ple[]d to a misprision offense and the conspiracy was dropped. No testimony to a claim of any larger share and no proof of any extra participation by him in being an[] organizer or leader. **He is simply a supplier and ple[]d guilty to that. And there should not be an enhancement**." (emphasis supplied))—that petitioner's sentence should not have been enhanced in accordance with U.S.S.G. § 3B1.1(b) (Doc. 408, at 4-5). Accordingly, petitioner's arguments as they relate to counsel's "objections" to application of the U.S.S.G. § 3B1.1(b) enhancement are utterly specious.

[22]    Perez' ineffective assistance of counsel claim, as it relates to the "Odelle" information also lacks any merit. Petitioner cannot even establish that Stankoski was deficient for failing to use this information at his sentencing hearing, presuming for the sake of argument that counsel knew about it, as he has cited to no authority establishing that such information would have precluded this Court from determining that he was a manager/supervisor for purposes of applying the U.S.S.G. § 3B1.1(b) three-level enhancement. In other words, petitioner has not explained how "Odelle" supplying the Wilsons with narcotics would necessarily foreclose the ability of this Court to find that he played the role of manager/supervisor with respect to the methamphetamine conspiracy alleged in the indictment, it being Tammy Wilson's testimony that Perez was the only person who supplied her husband and her with "methamphetamine." (Doc. 312, at 21.) Accordingly, petitioner's conclusory "Odelle" claim has no merit.

record, or the claims are patently frivolous, a district court is not required to hold an evidentiary hearing."); *see Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) ("A petitioner is *not* entitled to an evidentiary hearing . . . when his claims are merely conclusory allegations unsupported by specifics or contentions that in the face of the record are wholly incredible." (internal quotation marks omitted)), *cert. denied sub nom. Tejada v. Singletary*, 502 U.S. 1105, 112 S.Ct. 1199, 117 L.Ed.2d 439 (1992); *cf. Lynn v. United States*, 365 F.3d 1225, 1239 (11th Cir.) ("Because the 1999 affidavits submitted by Lynn amount to nothing more than mere conclusory allegations, the district court was not required to hold an evidentiary hearing on the issues and correctly denied Lynn's § 2255 motion."), *cert. denied,* 543 U.S. 891, 125 S.Ct. 167, 160 L.Ed.2d 154 (2004).

Pursuant to Rule 11(a) of the Rules Governing § 2255 Proceedings, the undersigned recommends that a certificate of appealability in this case be denied. 28 U.S.C. foll. § 2255, Rule 11(a) ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."). The habeas corpus statute makes clear that an applicant is entitled to appeal a district court's denial of his habeas corpus petition only where a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1).  A certificate of appealability may issue only where "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2243(c)(2).  Where, as here, a habeas petition is being denied  in part, on procedural grounds without reaching the merits of an underlying constitutional claim, "a COA should issue [only] when the prisoner shows . . . that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right

and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling[,]" *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 1604, 146 L.Ed.2d 542 (2000), and, in part, on the merits of underlying constitutional claims, a COA should issue only when the petitioner demonstrates "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong[,]" *id.; see also id*. at 483-484, 120 S.Ct. at 1603-1604 ("To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under Barefoot, includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were '"adequate to deserve encouragement to proceed further."'"); *see Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003) ("Under the controlling standard, a petitioner must 'sho[w] that reasonable jurists could debate whether  (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further."'"). Inasmuch as it is clearly established that entry of a guilty plea waives all non-jurisdictional challenges to a conviction's constitutionality, *McMann v. Richardson, supra,* including claims of ineffective assistance of counsel that do not implicate the decision to plead guilty, *Wilson, supra*, a reasonable jurist could not conclude that this Court is in error for failing to reach the merits of petitioner's pre-plea ineffective-assistance-of-counsel claims, nor could a reasonable jurist conclude that petitioner should be allowed to proceed further with respect to these claims. *Slack, supra,* 529 U.S. at 484, 120 S.Ct. at 1604 ("Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the

39

case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further.”). Moreover, with respect to all (other) ineffective-assistance-of-counsel claims raised by petitioner the undersigned recommends that the Court find that reasonable jurists could not debate whether Perez’ § 2255 motion to vacate should be resolved in a different manner or that any of the remaining issues presented are adequate to deserve encouragement to proceed further. Accordingly, petitioner is not entitled to a certificate of appealability.

Rule 11(a) further provides: “Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue.”  If there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.  *Brightwell v. Patterson,* CA 11-0165-WS-C, Doc. 14 (Eleventh Circuit order denying petitioner’s motions for a COA and to appeal IFP in a case in which this Court set out the foregoing procedure); *see also Castrejon v. United States,* 2011 WL 3241817, *20 (S.D. Ala. June 28, 2011) (providing for the same procedure), *report & recommendation adopted,* 2011 WL 3241580 (S.D. Ala. July 29, 2011); *Griffin v. DeRosa*, 2010 WL 3943702, at *4 (N.D. Fla. Sept. 20, 2010) (providing for same procedure), *report & recommendation adopted sub nom. Griffin v. Butterworth,* 2010 WL 3943699 (N.D.Fla. Oct. 5, 2010).

## CONCLUSION

The Magistrate Judge is of the opinion that petitioner’s rights were not violated in this cause and that his request to vacate, set aside or correct his sentence (Doc. 422; *see also*

Doc. 425) should be **DENIED**. Petitioner is not entitled to a certificate of appealability and, therefore, he is not entitled to appeal *in forma pauperis*.

The instructions which follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

**DONE** this the 29th day of January, 2013.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**

## MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND RESPONSIBILITIES FOLLOWING RECOMMENDATION, AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

l.      *Objection*.  Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this court.  Failure to  do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the Magistrate Judge.  *See* 28 U.S.C. § 636(b)(1)(C); *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982)(*en banc*). The procedure for challenging the findings and recommendations of the Magistrate Judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a 'Statement of Objection to Magistrate Judge's Recommendation' within ten days[23] after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.      *Transcript (applicable Where Proceedings Tape Recorded)*.  Pursuant to 28 U.S.C. § 1915 and FED.R.CIV.P. 72(b), the Magistrate Judge finds that the tapes and original records in this case are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

---

[23]      Effective December 1, 2009, the time for filing written objections was extended to "14 days after being served with a copy of the recommended disposition[.]" Fed.R.Civ.P. 72(b)(2).